## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| **DEUTSCHE BANK SECURITIES,)** | | |
| **INC. )** | | |
| ) | | |
| **Plaintiff,** ) | **Case No.** | |
| ) | | |
| **v.** ) | | |
| ) | | |
| **TONY ROSCOE PRUITT,** ) | | |
| ) | | |
| **Defendant.** ) | | |

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF THEIR APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff Deutsche Bank Securities, Inc. ("Deutsche") file this Memorandum of Law in Support of its Application for Temporary Restraining Order and Preliminary Injunction.[1]

### I. PRELIMINARY STATEMENT

Defendant Tony Pruitt ("Pruitt")[1] abruptly left his employment with Deutsche Bank on December 12, 2001 and immediately went to work for Deutsche Bank's competitor, Wells Fargo Advisors, LLC ("Wells"). This claim for

---

[1] Simultaneous with the commencement of this action, Plaintiff commenced an arbitration proceeding against Defendant and his new employer, Wells Fargo Advisors, LLC, before FINRA seeking permanent injunctive relief. Pending final determination in this arbitration, Plaintiff is entitled to seek preliminary injunctive relief from this Court, even though the merits of the dispute between the parties ultimately will be resolved in arbitration. Rule 13804 of the FINRA Code of Arbitration Procedure for Industry Disputes requires a party seeking interim injunctive relief to obtain such relief from a court of competent jurisdiction. A copy of this rule is attached as **Exhibit A**.

injunctive relief arises from the violation of trade secrets law, conversion and misappropriation by Pruitt of confidential information pertaining to Deutsche Bank accounts representing $1 billion in assets under management, generating approximately $5 million in commission revenues for the last twelve months alone, and Pruitt's efforts to divert those account to his new employer, Wells Fargo.  At the time Pruitt left Deutsche Bank, he worked in a partnership with Barry Sobel and Susan Thornton.  Pruitt did not develop these clients independently, but was assigned them by Deutsche Bank and by his partners.  Pruitt was the junior partner on the team.

Pruitt was bound by Deutsche Bank's Non-Solicitation Obligations Policy that applied to all employees who were Vice Presidents, such as Pruitt.  The policy provides:

> All employees who hold the title of Vice President or above will also be subject to a non-solicitation requirement.  The Non-Solicit policy provides that during your employment and for 120 days thereafter (the "Non-Solicit Period"), you will not, directly or indirectly, solicit or facilitate obtaining business from any Deutsche Bank client which was a client of your division at any time during your employment, in any case other than for Deutsche Bank; induce or attempt to induce any such client to reduce or terminate its business with Deutsche Bank; or directly or indirectly, solicit, induce, cause, participate or assist any third party in soliciting any employee from your division to work for you or any entity.  The Non-Solicitation Period will begin to run on the date you commence employment and end on the date that is 120 days following the date on which your employment termination

becomes effective, which, if you have a Notice Period, will be the last date of the Notice Period. (**Exhibit A**).

Pruitt accepted the terms of this policy on October 17, 2011. (**Exhibit B**).

In the year leading up to Pruitt's resignation from Deutsche Bank he began to fail to carry out his job duties in a manner that was consistent with his job duties. Pruitt started to take extensive vacation time in a manner that was inconsistent with providing consistent services to clients. Without clearing it with Deutsche Bank or his other more senior team members, Pruitt went on a vacation out of the country for thirty days. In total he took six weeks of vacation time in 2010. This worried Deutsche Bank and Pruitt's partners, as a thirty-day vacation was not consistent with providing solid services to clients, some of whom needed services more often than every thirty days and had daily needs and concerns about their investments.

Upon leaving Deutsche Bank, Pruitt misappropriated Deutsche Bank's confidential, customer information (in violation of Deutsche Bank's confidentiality policies) and is using this information to solicit Deutsche Bank's clients. Pruitt has admitted that he has been planning to leave Deutsche Bank for six months and that he has taken "notes" with him. Pruitt also stated to Martha Stevens that he called in sick on the days he travelled to St. Louis, Missouri to meet with Wells Fargo to

plan his departure and that Wells Fargo provided Pruitt with an enticement to join Wells Fargo and to attempt, wrongfully, to bring clients to Wells Fargo by deceptive means and by utilizing pre-prepared hard solicitation letters including account transfer forms addressed to specifically targeted Deutsche Bank Clients, many of whom he did not know. (See Declaration of Martha Stephens, attached as **Exhibit C**).  The account transfer forms are via an electronic system whereby once a client signs the document and Wells Fargo starts the process all of the customer's accounts and holdings automatically transfer.

Since leaving Wells Fargo, Pruitt did in fact send letters out to large numbers of Deutsche Bank clients and included account transfer forms along with the solicitation letters.  An Example of such a letter is attached as **Exhibit D**.  This particular client had no real involvement with Pruitt and was disturbed that Pruitt would take her personal information, use it to solicit her and presume to send her an account transfer packet.  It is particularly worrisome that Pruitt referenced the composition of the client's account as that implies that he has taken account-related documents from Deutsche Bank.  An email from this client expressing her dissatisfaction with Pruitt taking her personal information and using it to try to get her to transfer her account is attached as **Exhibit E**.

Upon information and belief, this solicitation has gone out to almost a hundred clients, including large numbers of clients who never worked with Pruitt. Pruitt could only have each of these client's name and contact information from having copied it from Deutsche Bank's confidential information.  Critically, the wording of the solicitation and the calls made by Pruitt have created the impression that Pruitt's other team members, Susan Thorton and Barry Sobel, (both the senior members of the team) also left Deutsche Bank along with Pruitt. A few examples of client's being contacted are listed below.

- Pruitt contacted Susan Thornton's neighbor after he left Deutsche Bank. This client was not someone with whom Pruitt had worked, but he still sent her the account transfer forms and called the neighbor on her cellphone, a number that is not publicly listed and could only have come from Deutsche Bank's confidential information.  The client stated that she had not provided her cellphone number or address to Pruitt. (See Declaration of Thornton, attached as **Exhibit F**).

- Pruitt contacted Susan Thornton's mother's friend, also a client of Thornton.  The particular client is elderly and but Pruitt told her that she should just sign the transfer papers. (See Declaration of Thornton, attached as **Exhibit F**).

- Pruitt contacted a 90-year old client living in Arizona.  Based on Pruitt's representations, this client thought that Barry Sobel, with whom he had a long-standing relationship, had also left Deutsche Bank. Pruitt had not worked with this client prior to leaving Deutsche Bank. (See Declaration of Sobel, attached as **Exhibit G**).

- Pruitt additionally sent a solicitation letter and account transfer form to Sobel's college roommate, despite the fact that he had never worked with him and the account had a $0.00 balance.  This is indicative of Pruitt copying wholesale all client information for the whole team. (See Declaration of Sobel, attached as **Exhibit G**).

- Sobel is also aware of Pruitt sending solicitation and transfer forms to three more of Sobel's clients with whom Pruitt had not worked. (See Declaration of Sobel, attached as **Exhibit G**).

Such wrongful activity, however clumsy, threatens Deutsche Bank with irreparable harm in a variety of ways, including present and future economic loss, disclosure of proprietary and confidential business and customer information, loss of goodwill and business reputation and injury to office stability.  Moreover, Pruitt did not just take information pertaining to clients who he had direct contact with, but he took and used information that relates to clients that were only serviced by

Sobel and Thornton.  In contacting clients Pruitt has been creating the impression,

particularly for elderly clients, that the whole team has left Deutsche Bank.  This is

not proper and jeopardizes Deutsche Bank's and his remaining team members',

long-standing relationships with their clients.  The misappropriation of Deutsche

Bank's information, which upon information and belief Pruitt copied directly off of

Deutsche Bank's servers, is a violation of the agreement Pruitt made with Deutsche

Bank regarding Deutsche Bank's Confidentiality Policy. (**Exhibits B & H**).

Deutsche Bank's Confidentiality Policy provides:

Confidential Information also includes information regarding
Deutsche Bank clients, including without limitation, client lists, client
relationships, client personal financial data, pending or contemplated
client orders, securities positions, trading strategies, assignments,
planned and executed transaction details, accounts, account
statements, payment history and related information, any information
given to Deutsche Bank by or about its clients and personal
information (which means any information that relates to an
individual client, including but not limited to, financial information,
medical or health-related information, and personally identifiable
information).  The sharing of financial information of any Deutsche
Bank client, even within Deutsche Bank, is subject to limitations
under applicable regulations privacy laws. (**Exhibit H**).

For these reasons, Deutsche Bank asks the Court to enter a Temporary

Restraining Order to restrain Pruitt (and those acting in concert with Pruitt) from

continuing to violate his obligations until a preliminary injunction hearing may be

held before a FINRA arbitration panel.

7

## II. ARGUMENT AND AUTHORITIES

### A. DEUTSCHE BANK IS ENTITLED TO SEEK TEMPORARY INJUNCTIVE RELIEF IN THIS COURT PENDING ARBITRATION

Even where a dispute (as here) is ultimately to be resolved in arbitration, Deutsche Bank is entitled to injunctive relief pending the outcome in arbitration. Many courts have held that a court can grant injunctive relief in an arbitrable dispute pending arbitration, as long as the prerequisites for injunctive relief are satisfied. *See, e.g., Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1380 (6th Cir. 1995) (the withholding of injunctive relief would render the process of arbitration meaningless or a hollow formality); *Wells v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 919 F. Supp. 1047, 1050 (E.D. Ky. 1994). *See also American Exp. Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998) (arbitration does not absolve the district court of its responsibility to decide requests for preliminary injunctions on their merits); *American Express Financial Advisors v. Makarawicz*, 122 F.3d 936, 940 (11th Cir. 1997); *Blumenthal and Fein v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1051-53 (2d Cir. 1990) (injunctive relief can be granted to prevent the arbitration from becoming a "hollow formality"); *Ortho Pharmaceutical Corp. v. Amgen, Inc.*, 882 F.2d 806, 812-13 (3d Cir. 1989); *PMS Distributing Co., Inc., v. Huber & Suhner, A.G.*, 863 F.2d 639, 642 (9th Cir. 1988); *Teradyne, Inc. v.*

*Mostek Corp*. 797 F.2d 43 (1st Cir. 1986). *See also Roso-Lino Beverage Distrib. v. Coca Cola Bottling Co.*, 749 F.2d 124 (2d Cir. 1984); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048 (4th Cir. 1985); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Salvano*, 999 F.2d 211 (7th Cir. 1993); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dutton*, 844 F.2d 726 (10th Cir. 1988). *See also, Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 777 F. Supp. 1349 (N.D. Tex.), aff'd., 948 F.2d 1286 (5th Cir. 1991), cert. denied, 504 U.S. 930, 112 S.Ct. 1994 (1992), and *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty*, 808 F. Supp. 1555 (S.D. Fla. 1993), aff'd., 2 F.3d 405 (11th Cir. 1993). "These cases represent solid judicial precedent in support of this court's authority to impose injunctive restraints pending arbitration to prevent arbitration from being rendered a 'hollow formality' and to preserve the 'meaningfulness of the arbitration.'" *Wells v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 919 F. Supp. at 1051.

Without the intervention of this Court Pruitt will be able to continue to use Deutsche Bank information to solicit clients and continue to create the impression that Sobel, Thornton and Stephens have also left.

## B. DEUTSCHE BANK IS ENTITLED TO A TEMPORARY RESTRAINING ORDER

Deutsche Bank does not seek to bar Pruitt from working for its competitor. Deutsche Bank is instead attempting to protect its business from the misuse of confidential information to solicit and take its clients in conformity with the Deutsche Bank codes to which Pruitt agreed. Deutsche Bank will sustain immediate and irreparable injury if a temporary restraining order is not issued.  As a result of Pruitt's violations of his respective Agreements, Deutsche Bank has suffered and will continue to suffer irreparable harm, and is entitled to an order restraining such conduct until a preliminary injunction hearing may be set and heard.

## C. DEUTSCHE BANK IS ENTITLED TO A PRELIMINARY INJUNCTION

## 1.     Judicial Standard:

The Georgia Trade Secrets Act, O.C.G.A. §§ 10-1-761 *et seq.*, allows for a court to enjoin actual and threatened misappropriation of an employer's confidential and trade secret information. O.C.G.A. § 10-1-762; see *American Bdgs. Co. v. Pascoe Bldgs. Sys., Inc.*, 392 S.E.2d 860, 864 (Ga. 1990) ("[w]hen one has acquired knowledge of a trade secret by reason of a confidential business relationship with the holder of the trade secret, an injunction restraining divulgence of the trade secret will lie.")

Georgia law defines a "trade secret" as information, including "a list of actual or potential customers," which is not commonly known or available to the public and which:

a) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.C.G.A. § 10-1-761(4).  In addition, the Act defines "misappropriation" as "(A) Acquisition of a trade secret by a person who knows or has reason to know that the trade secret was acquired by improper means;[2] or (B) Disclosure or use of a trade secret of another without express or implied consent.." O.C.G.A. § 10-1-761(2). Pruitt has admitted that he improperly accessed Deutsche Bank's customers' information from his home computer via a remote connection and then copied down through some medium the information by hand to circumvent Deutsche Bank's protections that it put in place to protect its clients' information.  He has then used this list or lists to solicit clients, including large numbers of clients that he did not work with to join Deutsche Bank.  An example of one of the solicitations that he sent out to a client that he did not work with is attached as

---

[2] "Improper" means includes "breach of inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use.." O.C.G.A. § 10-1-761(1).

**Exhibit D**.  This and other solicitations have already damages Deutsche Bank and created the impression that the whole team has left.  Without the Court's intervention, this impermissible conduct will continue to damage Deutsche Bank. Deutsche Bank has to request this relief in order to fend off future claims that it did not make reasonable efforts to maintain the secrecy of its trade secret information.

## 2. Courts Have Almost Uniformly Recognized The Right Of A Securities Firm To Injunctive Relief Under Similar Circumstances

Courts considering circumstances similar to those here have repeatedly held in favor of injunctive relief to prohibit the solicitation of the former employer's clients or protect the misappropriation of confidential client and trade secret information prior to an adjudication on the merits. See e.g., *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hegarty*, 2 F.3d 405 (11th Cir. 1993), aff'g w/o opinion *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty*, 808 F. Supp. 1555 (S.D. Fla. 1992); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano,* 999 F.2d 211 (7th Cir. 1993); *Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 948 F.2d 128 (5th Cir. 1991) (per curiam), aff'g 777 F. Supp. 1349 (N.D. Tex. 1991); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dutton*, 844 F.2d 72 (10th Cir. 1986); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley,* 756 F.2d 1048 (4th Cir. 1985); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Stidham*, 658 F. 2d 1098 (5th Cir. 1981).

About thirty years ago, the United States Court of Appeals for the Fifth Circuit, Unit B, considered the remedy for the violation of a nondisclosure covenant which was apparently perpetual in duration.  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Stidham*, 658 F.2d 1098 (5th Cir. Unit B 1981).  The court held that the provision of the contract which declared that customer records were the property of Merrill Lynch was an agreement that fixed "title of physical documents" and required "confidentiality during employment."  Despite the long history under Georgia law of not enforcing nondisclosure covenants without time limits, see *e.g.*, *Howard Schultz & Assoc., Inc v. Broniac*, 239 Ga. 181 (1922) the court held that a permanent injunction against the use of Merrill Lynch's records was a proper exercise of the court's discretion, given the blatant breach of the contract.  The Court felt it was proper to enjoin defendants from reaping the benefits of its ill-gotten information during the post-employment period.

In accepting employment with Deutsche Bank, Pruitt expressly promised not to solicit Deutsche Bank's clients, to keep Deutsche Bank information confidential and not to use it for the benefit of himself or another competing company.  Pruitt, however, has violated these terms that he agreed to, as well as his common law duties to Deutsche Bank.

Pruitt apparently did it for the benefit of Wells Fargo, and upon information and belief to get compensation for himself, while still employed by Deutsche Bank, and as a result the account transfer documents were waiting for him at Wells Fargo for transmission the day he left Deutsche Bank.  Deutsche Bank does not seek to bar Pruitt from earning a living, even though his doing so will be with a competitor in the same locale. Deutsche Bank is merely attempting to protect its business from the pirating of and misuse of confidential information to steal its clients, including clients that were assigned to Pruitt and clients with whom Pruitt never worked.

**3. Deutsche Bank Satisfies All Requirements For Injunctive Relief**

**a. Deutsche Bank Is Likely To Succeed On The Merits**

Deutsche Bank is entitled to injunctive relief to prevent Pruitt from violating his  obligations to Deutsche Bank not to solicit Deutsche Bank's clients and personnel and from disclosing Deutsche Bank's confidential and proprietary documents and information and trade secrets.  Pruitt agreed to keep Deutsche Bank information private and confidential and not to solicit clients after he left Deutsche Bank using Deutsche Bank information.  Pruitt has misused this confidential and proprietary business documents and information in violation of Georgia law. Based on the wide scale solicitation that has just began to come to light it is clear

that Pruitt has taken information pertaining to Deutsche Bank clients and is using this information to solicit clients to transfer their accounts to Deutsche Bank. Pruitt could not have remembered client identities, much less specific addresses, for clients with whom he never worked at all.  It is only by copying Deutsche Bank information from Deutsche Bank's servers that this could have been accomplished.

Deutsche Bank is entitled to relief because Pruitt has misappropriated Deutsche Bank trade secrets and information.  As laid out above, a client list is a trade secret under Georgia law and Pruitt had admitted that he improperly accessed this information and copied it down.  The fact that Deutsche Bank's computer system prohibited him from printing or electronically copying this information does not make it less of a trade secret, but more of one.  This added protection is exactly why this information is entitled to trade secret status and shows how far Pruitt went to take this information.  There is no way that Pruitt just remembered each of these clients and their phone numbers and addresses, particularly for <u>clients with whom he did not work</u>.

Georgia courts have explicitly found that customer lists for brokerage firms are trade secrets under Georgia law.  In *Merrill Lynch, Pierce Fenner & Smith, Inc. v. Brambila*, No. 92-346-1-MAC (M.D.Ga. 1992), the court held a client lists was clearly a trade secret from which a broker-dealer derived significant economic

benefits. *Id.* at p. 8.  In this case, Deutsche Bank's customer records and

information qualify for trade secret protection. These records are what Pruitt used

to create contact lists he delivered to Wells Fargo.  Along with its employees,

Deutsche Bank's clients are its most important assets.  Deutsche Bank's records

contain (among other things) the names of actual and potential customers,

addresses and unique investment characteristics and financial data pertaining to its

individual customers. This information enabled Deutsche Bank to serve its

customers effectively. In addition, the information contained in Deutsche Bank's

records is not readily available to the general public or Deutsche Bank's

competitors from a telephone book, library, professional directory or other publicly

available resource. Deutsche Bank's competitors do not have access to and cannot

independently obtain without a substantial expenditure of time, money and effort

the totality of information that Defendants have taken. Indeed, without contacting

each customer individually, Deutsche Bank's competitors could not acquire access

to the information contained in Deutsche Bank's records regarding income, net

worth, investment objectives, prior investment experience, current money

balances and the current securities position of Deutsche Bank customers. The value

of the trade secret customer lists that were copied by Pruitt is enormous,

representing almost $1 billion in assets under management and $5 million in

revenue during the past twelve months. Based on these facts, it is clear that Deutsche Bank's customer records derived independent economic value from not being known to the public or its competitors.

In utilizing Deutsche Bank customer information to solicit Deutsche Bank clients, Pruitt has misappropriated Deutsche Bank's trade secrets and violated Deutsche Bank's confidentiality policies

**b. No Adequate Remedy at Law Exists**

Deutsche Bank will suffer irreparable harm in the absence of injunctive relief. To establish irreparable harm, a plaintiff must show that a breach could not be quantified. For example, in *Merrill Lynch v. Stidham*, 658 F.2d 1098 (5th Cir. 1981), the Fifth Circuit Court of Appeals (now the Eleventh Circuit) held that improper use of confidential information caused irreparable harm sufficient to support a permanent injunction. The Fourth Circuit reiterated this concept in *Multi-Channel TV Cable Company v. Charlottesville Quality Cable*, 22 F.3d 546, 551 (4th Cir. 1994 ("[w]here the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied"). Although the precise extent of Deutsche Bank's harm cannot be ascertained, what is certain is that Deutsche Bank has

suffered and will continue to suffer irreparable injury in the form of disclosure and use of its trade secrets by a competitor if injunctive relief is not granted.

It is extremely difficult to quantify the future economic losses that Deutsche Bank will suffer from the loss of its clients and their accounts to a competitor. How many of these clients' accounts would have grown in the future or by how much Deutsche Bank cannot now calculate. In addition, Deutsche Bank cannot quantify the loss of client confidence that will occur absent an injunction. The loss of confidence will occur because clients, who entrusted their confidential information to Deutsche Bank, are now being contacted by a financial advisor who they do not know and a firm, Wells Fargo, that they did not agree to provide their information to.  Irreparable harm lies, in part, in the fact that Deutsche Bank's clients expect their financial information, their market transactions, and their investment assets to be known only to themselves, Deutsche Bank and Deutsche Bank's registered representatives. As one court observed, "[i]rreparable and immeasurable harm lies in the fact that Merrill Lynch clients, when they discover that their financial information, market transactions, and investment assets which they presumed were held in confidence have been disclosed, will lose trust and confidence in Merrill Lynch." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kramer,* 816 F. Supp. 1242, 1247 (N.D. Ohio 1992); see also *Systematic Business Services, Inc. v.*

*Bratten,* 162 S.W.3d 41, 51 (W.D. Mo. 2005) ("The former employer need not show actual damages to enforce the covenant if the covenant is lawful and the opportunity to influence employer's customers exists."); *Merrill Lynch, Pierce, Fenner Smith, Inc. v. Rodger*, 75 F. Supp. 2d 375, 381-82 (M.D. Pa. 1999) (the court found irreparable harm because "customers will lose trust and confidence in [Merrill Lynch] if they discover that ex-employees have divulged to others private financial information like account value, market transactions and investment assets*."); Sigma Chemical Co. v. Harris*, 586 F. Supp. 704 (D.C. Mo. 1984) ("the equities do not favor defendant due to the evidence that defendant's breach of the restrictive covenant was willful").

In addition, as the Second Circuit has held, "'loss of trade secrets cannot be measured in money damages' because '[a] trade secret once lost is, of course, lost forever.'" *North Atlantic Instruments, Inc. v. Haber,* 188 F.3d 38, 49 (2d Cir. 1999) (finding irreparable harm based in part on the fact that the employee had "acknowledged in his Employment Agreement that a breach of the confidentiality clause would cause 'irreparable injury' to [his former employer).

As a result of Defendants' misconduct, Deutsche Bank has suffered and will continue to suffer irreparable harm, and, thus, is entitled to preliminary injunctive

relief. *See Webcraft Technologies, Inc. v. McCaw,* 674 F. Supp. 1039, 1046, 1048

(S.D.N.Y. 1987).

**c. The Benefit Of Granting Injunctive Relief Outweighs Denial And Is In The Public Interest**

Under the circumstances of this case, the benefit of injunctive relief to

Deutsche Bank far outweighs any detriment to Defendant.  An injunction would

protect Deutsche Bank's investment in its confidential information and would

promote the public interest in the privacy of the information customers have

delivered to their financial firms.  Remember, the information received by Pruitt

and other Deutsche Bank employees is received only by them as Deutsche Bank

employees and is subject to the Deutsche Bank privacy policy.  To allow Pruitt to

disclose that information at his initiative to Wells Fargo without penalty would

violate the public interest in privacy of information.  An injunction would also

serve to discourage other Deutsche Bank employees and competitors from

inducing Deutsche Bank employees to breach their fiduciary duties and their duties

of loyalty.  Pruitt has deliberately misappropriated Deutsche Bank's and clients'

confidential information use at another competing company.

Accordingly, the public interest is served by issuance of the preliminary

injunction that Deutsche Bank seeks. *See Merrill Lynch, Pierce, Fenner & Smith,*

*Inc. v. Zimmerman*, 1996 WL 707107, *3 (D. Kan. Oct. 1, 1996) ("[T]here is a

strong public interest in favor of protecting trade secrets"); *Kramer*, 816 F. Supp.

at 1248 ("To deny injunctive relief in this case would . . . jeopardize the integrity

of the securities industry and to the detriment of the public interest [and]

. . . would cast doubt on the integrity of contractual agreements"). As a court in

Illinois observed in a case involving another securities firm's agreements with its

registered representatives, "[t]he public has an interest in preventing unfair

competition, commercial piracy, misleading solicitations, and in safeguarding the

confidentiality of financial records*." IDS Life Insurance Co. v. SunAmerica, Inc.,*

958 F. Supp. 1258, 1282 (N.D. Ill. 1997), aff'd in part, vac. in part on other

grounds, 136 F.3d 537 (7th Cir. 1998). Consequently, the court explained, "the

public's interest has been disserved by defendants' actions" because "[t]he public

has no interest in destroying contracts, rewarding theft, and encouraging unethical

business behavior." *Id.*  Client's reaction to and confusion by Pruitt's solicitations

demonstrates that the sought after restriction is in the public's interest.  Some

clients are dissatisfied that their information has been taken and used by Pruitt.

Other client, particularly older clients, are confused by Pruitt's misrepresentations

and are under the impression that Sobel and Thornton have also left Deutsche

Bank.  Neither of these two results are in the best interest of clients, i.e. the public.

The public's interest is best served by their information being kept confidential and them not being misled.

Finally, Pruitt will not be precluded from engaging in their chosen profession. The injunction sought merely seeks the return and of trade secrets and that clients not be solicited using such information. Thus, Defendant would be able to provide services to any company, including Wells Fargo, as long as they do not use Deutsche Bank's confidential information. The injunction will only require Pruitt to compete fairly.

**d. The Balance Of Hardships Is In Favor of Deutsche Bank.**

Courts applying Georgia law have found that in cases involving willful trade secret misappropriation, which is exactly what Pruitt did, the balance of the hardship clearly favors the party seeking the injunction. *Coca-Cola v. Reed Indus., Inc.*, Civil Action File No. 1:85-CV-3235-MHS, 1988 U.S. Dist. LEXIS 16551, at * 25 (N.D. Ga. Feb. 17, 1988).  In this case, Deutsche Bank is merely seeking the return of client lists and other documents containing its client information and a prohibition on Pruitt, and those acting in concert with him, from continuing to profit from these trade secrets.  Deutsche Bank has filed concurrently with this request for injunctive relief a Statement of Claim before a FINRA Arbitration panel.  Under FINRA's arbitration rules, if this Court issues the sought after

injunction, an expedited arbitration will be scheduled to take place within fifteen days.  The sought after injunction will allow Deutsche Bank to preserve its rights pending that expedited arbitration.  However, if this Court does not grant the injunction sought, under FINRA rules, the arbitration will not be expedited and Deutsche Bank will not be able to have its request for injunctive relief heard for months, and likely not for until a year from now.  During that time Pruitt will have continued to use Deutsche Bank's confidential information.  Deutsche Bank is merely seeking a return to the status quo pending the expedited FINRA arbitration, where Pruitt and Wells Fargo are not in possession of the ill-gotten information.  While it will seek such a permanent injunction as is permitted by *Stidham* at arbitration, all Deutsche Bank is asking for now is relief that will last under the fifteen-day FINRA arbitration.

Granting the injunction will not harm Pruitt in any legally recognizable way.  Instead, he would only be prohibited from using Deutsche Bank's property that he acquired through improper means to unfairly compete against Deutsche Bank.  In totality, the requested injunction would merely require Pruitt to return information he should never have taken and not use this information to solicit clients.

It is the law's function to maintain a reasonable balance in this area.  Deutsche Bank is not seeking an extraordinary remedy, but merely to protect itself

against obvious misappropriation of trade secrets.  Because the requested relief would do no more than prevent Pruitt from having and utilizing information he should never have taken, the balance of the hardships decidedly favor Deutsche Bank.

In fact, a TRO restraining Pruitt from further misuse and misappropriation of Deutsche Bank's intellectual property would advance the public interested reflected in the Georgia Trade Secrets Act.

## III. CONCLUSION AND PRAYER

Deutsche Bank is not asking that Pruitt be restrained from working at Wells Fargo or anywhere else. Deutsche Bank is instead asking that the Court enter a Temporary Restraining Order preventing Pruitt from continuing to possess Deutsche Bank trade secrets and use them to solicit clients until an evidentiary hearing may be held.  Accordingly, Deutsche Bank requests that the Court grant its application and enter a TRO.

Thereafter, Deutsche Bank requests for the reasons stated above, Deutsche Bank's motion for a preliminary injunction should be granted, pending a final award in the FINRA arbitration between Deutsche Bank and Pruitt.

This 21st day of December, 2011

BROCK, CLAY, CALHOUN & ROGERS, LLC.


BY:   s/ Charles M. Dalziel Jr., Esq._____
          Georgia Bar # 203730
          Stuart L. Sims, Esq.
          Georgia Bar # 648778
          Attorneys for Plaintiff

49 Atlanta St.
Marietta, GA  30060
(770) 422-1776
(770) 426-6155 – facsimile
cdalziel@brockclay.com
ssims@brockclay.com

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

DEUTSCHE BANK SECURITIES,)
                      INC. )
                          )
       Plaintiff,       )     Case No.
                          )
v.                        )
                          )
TONY ROSCOE PRUITT,     )
                          )
Defendant.          )

## CERTIFICATE OF COMPLIANCE WITH L.R. 7.1D, NDGa

Pursuant to L.R. 7.1D, NDGa the undersigned counsel hereby certifies that the foregoing pleading was prepared with one of the font and point selections approved by the court in L.R. 5.1C, NDGa.

This 21st day of December, 2011

                       **BROCK, CLAY, CALHOUN & ROGERS, LLC**

                       __s/ Charles M. Dalziel, Jr., Esq._____
                       Georgia Bar # 203730
                       Stuart L. Sims, Esq.
                       Georgia Bar # 648778
                       49 Atlanta St.
                       Marietta, GA 30060
                       (770) 422-1776
                       (770) 426-6144 Facsimile
                       cdalziel@brockclay.com
                       ssims@brockclay.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

DEUTSCHE BANK SECURITIES,)
        INC. )
          )
    Plaintiff,    )   Case No.
          )
v.          )
          )
TONY ROSCOE PRUITT,   )
          )
Defendant.      )

### CERTIFICATE OF SERVICE

The undersigned does hereby certify that a copy of **Plaintiff's Memorandum of Law in Support of their Application for Temporary Restraining Order and Preliminary Injunction** has been served upon the following by Regular U.S. Mail this 21st day of December, 2011.

Tony R. Pruitt
Wells Fargo Advisors, LLC
6455 E. Johns Crossings
Suite 125
Duluth, GA 30097

Tony R. Pruitt
1377 Village Park Dr.
Atlanta, GA 30319

**BROCK, CLAY, CALHOUN & ROGERS, LLC**

 _s/ Charles M. Dalziel, Jr., Esq._____
Georgia Bar # 203730

27

Stuart L. Sims, Esq.
Georgia Bar # 648778
49 Atlanta St.
Marietta, GA 30060
(770) 422-1776
(770) 426-6144 Facsimile
cdalziel@brockclay.com
ssims@brockclay.com